MAEA UAINA, Plaintiff

v.

PATISEPA MANUU, MA'ATAUA TE'O, VILIAMU, and MILIAMA, Defendants

MAGALEI LOGOVI'I, PATISEPA PEI (MANUU), and MOEA'I UILIATA, Plaintiffs

v.

MAEA UAINA, Defendant

High Court of American Samoa
Land and Titles Division

LT No. 01-87
LT No. 33-87

June 7, 1989

Before KRUSE, Chief Justice, Vaivao, Associate
Judge, Afuola, Associate Judge.

Counsel: For Maea, Aviata F. Fa'alevao
For Te'o and Siufanua, Tauese P. Sunia
For Patisepa Pei, Tauivi Tuinei
For Magalei, L. Suesue Lutu
For Moea'i, Togiola T.A. Tulafono

The parties herein are either matai of Faleniu
or claimants through Faleniu matai. These
consolidated matters involve a certain land area
traditionally known as "Leaveave" which was part of
the subject matter of earlier litigation in which
the chiefs of Faleniu prevailed against the claims
of A'asu villagers. See Magalei v. Lualemana, 4
A.S.R. 242 (1962). The matters before us arose
following the attempts of one of those Faleniu
matai, Maea Uaina, to claim and register a portion
of Leaveave as the communal land of the Maea
family. In early January, 1987, Maea filed a
petition with the Court seeking injunctive relief
against the ongoing agricultural activity of the
named defendants in LT No. 1-87. He shortly
thereafter commissioned a survey of his land claim
and filed for title registration with the Office of
the Territorial Registrar pursuant to A.S.C.A. §§
37.0101 et seq. This application to register title
also attracted a number of objections from others
in Faleniu and resulted in the case docketed LT No.
33-87. The files were consolidated for trial on
the merits, and, in preparation for trial, the
other parties also had surveys of their own
respective land claims prepared by the same
surveyor. The surveyor, who was called to testify,
presented a composite drawing which laid out the
different surveys on a topographical map of the
vicinity. At the conclusion of the evidentiary
hearing, the Court also viewed the actual land
area.

## Discussion

A small, southern portion of Maea's land claim, which the parties commonly identified as part of "Puna," was not contested.[1] The said uncontested portion may therefore be registered as the communal land of the Maea family pursuant to the provisions of A.S.C.A. §§ 37.0101 et seq. The remainder of Maea's surveyed claim is contested on the entire western half by the descendants of Manu Tuinei,[2] while the other parties' claim overlap the eastern part of his survey.

As mentioned above, the land area "Leaveave" was held to be the property of the chiefs of Faleniu in Magalei v. Lualemana, supra. Consistent with the findings in that case, the evidence here revealed that the land was originally cleared from its jungle state and then collectively cultivated in the manner of a "taloloa" --- a cooperative taro plantation developed from virgin bush and then divided up into units called "fata," with each developer assigned a certain number of fata to maintain and harvest --- by the villagers of Faleniu.[3] After original cultivation, the villagers, in addition to establishing other taloloa areas, returned at different intervals to the old clearings with the common understanding that one's assigned fata area became that person's family land. Some villagers would abandon the taloloa area temporarily (and then later return) while others continued to maintain crops.

We also gathered on the testimony that over time, those working for the time being on the land did so without too much regard to the original limits of one's family fata and assigned land location. At different intervals of time,

---

[1] The opposing parties' abstinence was apparently purposive. Our viewing of the land revealed exclusive and settled occupation of this part of the land by the Maea people.

[2] This side's theory of entitlement defies definition. This group is comprised of the immediate descendants of the late Manu Tuinei who desire to hold the land "individually." They candidly admit, however, their difficulties in satisfying the standard of proof requisite to sustaining a claim in "individual" ownership. Accordingly the Court is requested to award land as the communal property of Manu Tuinei's descendants to the exclusion of the rest of the extended family Sa Manu.

[3] Much land in this area has been thus claimed from the tropical forest by Faleniu village. See Lualemana v. Filo, 3 A.S.R. 642 (1961); Lualemana v. Chiefs of Aitulagi 4 A.S.R. 383 (1963); Magalei v. Lualemana, supra; Galoia v. Mamoe, 3 A.S.R. 245 (1956).

therefore, some families of Faleniu would be more visible in these areas than others, and when they in turn left they were similarly displaced by others or the ever growing flora. (Indeed, when the members of the Court viewed the area, some parts of the land had reverted to bush; however, such areas were also claimed by the parties on the basis of past cultivation.)

From the manner in which the subject land has been used and occupied, it appeared to the Court that gradually over time the taloloa area came to be regarded by the village as common agricultural land. We see this for example with the manner in which a recent dispute over the land was handled. The dispute involved one of the parties hereto, Ma'a Te'o, and another villager. Differences between these parties were escalating towards a potential gun battle. At the suggestion of Chief Si'ufanua who had intervened at the behest of Ma'a Te'o, the matter was referred to the village council. The affair, although intense, was approached and handled as an intra-village matter and therefore the complications which would have been caused by entitlement questions in the context of an inter-family dispute were not there to hamper reconciliation. A solution was achieved after tribute was paid to the council which then granted or ratified permission to the continuing use of land by the parties. Further, and as can be seen from a review of the above referenced cases, the village chiefs have consistently defended the various taloloa areas against outsiders in a collective manner as opposed to responding severally as individual families. By the same token, the Faleniu Chiefs have by and large left undisturbed the interchanging use of these taloloa areas by various members of the village, except for one occasion when a prior Maea had unsuccessfully attempted to carve out for himself another portion of similar taloloa land known as "Tafeta." See Lualemana v. Chiefs of Aitulagi, 4 A.S.R. 383 (1963). Even with that matter the remainder of the village chiefs were concerted in their efforts and acted as one.

In the present matter, claimant Maea admitted that his family ceased actively maintaining crops in the area because of dwindling family numbers and also because of the fact that he had for many years taken on employment outside Faleniu in exchange for a paycheck. Maea had, along with many others,

opted to involve himself with that new and changing way of life which came about with the territory's emerging cash economy. After his recent retirement, Maea revisited the disputed land and discovered that others of the village were now in active possession of land areas which he felt were once held by his family. Hence his petition for a declaration that title to the land should be registered as his family's. Maea testified that the area he had surveyed was originally cleared and claimed by his ancestors and while evidence of his former crop activity had now been destroyed by the cattle farm presently maintained in the area by Ma'a Te'o, the unaffected coconut trees on the land were those planted by he and his ancestors. Maea also claimed that his ancestors had named the locale and he related a rather colorful, but fanciful, explanation of the origin of the term "Leaveave."

The history of the area, however, simply contradicts Maea's claim. The widely acclaimed village taloloa is by definition inconsistent with any claim to individual family cultivation. Secondly, the name "Leaveave" was more meaningfully explained by the opposing parties, as consistent with the area's physical topography and water runoff, than by Maea's narration relating to the ensnarement of his great grandfather's hunting dogs.

Alternatively, counsel for Maea contended that the village, after first clearing the bush, divided up the Leaveave area among the various families of Faleniu. He directed our attention to a remark by Chief Justice Morrow to this effect in Magalei v. Lualemana, supra, at 249. From this premise, counsel then submitted that his client's survey encompassed that division of Leaveave given to the Maea family by the village. Firstly, he referred us to another comment by Judge Morrow concerning that Court's viewing of plantations on Leaveave including "a coconut plantation of Maea" (the predecessor of the present Maea). Id. at 248. Secondly, counsel argued that certain coconut trees pointed out to the present panel of judges during their viewing of Leaveave, which were located within Maea's surveyed area, were the remnants of the same coconut plantation mentioned by Judge Morrow. In this regard, counsel also directed our attention to his client's earlier testimony to the effect that those existing coconut trees within

Maea's surveyed area were planted by Maea family members.

We have several problems with the contentious nature of this submission. Leaveave is a much larger area than that encompassed by Maea's survey. The coconut plantation viewed by the Court in 1961 is not necessarily the scattered trees which the present panel observed on the land surveyed by Maea. Indeed, some of these coconuts trees were also claimed to have been planted by the Magalei family, while other trees were said to have been the plantings of a one Leasiolagi during the times the A'asu people attempted to lay claims to the area. Further, it was very noticeable to the Court, when it viewed the area, that the extent of Maea's claim went significantly beyond the area of the scattered coconut growth. His survey included great areas of bushland which looked quite devoid of any signs of having ever supported even the hardy coconut tree. Indeed, apart from Magalei's survey, a common and striking feature of all the surveys, which became obvious to the Court at the land viewing, was the unrealistic and exaggerated extent to which the respective claims failed to reflect use and occupation, while extending to areas which bore little, if any, resemblance to arable land. We find it difficult to resist the conclusion that because Maea had taken upon himself the survey of a large tract of Leaveave, without the consent of the village council, and then pressed his claim all the way to the courthouse, the whole area was therefore treated as being up for grabs without any rational regard whatsoever to merit. The distinct impression we have of the respective surveys is one of arbitrariness. We are bolstered in this conclusion by the fact that none of the matai claimants, with the exception of Magalei, nor those through whom the non-matai parties claimed, were actually present at the physical survey of alleged family holdings.

The best that we can assemble from the evidence is that the disputed area was originally cleared and cultivated by the village of Faleniu in a collective effort. The tracts surveyed by the various parties overlap one another in the manner which roughly gives the appearance of concentric circles. At best, this manner of overlap suggests that at one time or another the principal "aiga"--- extended families --- of Faleniu had family members cultivating the disputed area.

Accordingly, we conclude in these circumstances that no one party has proven, on the preponderance of the evidence, a superior and exclusive entitlement to the land in dispute. While the Appellate Division in <u>Lualemana v. Magalei</u>, 4 A.S.R. 849 (1962), had affirmed a trial court finding that the Faleniu people had already divided up the taloloa area "Leaveave," that division is not, in our opinion, correctly reflected in the surveys tendered by the parties herein.

At one time during his testimony, ranking Chief Magalei made known his regrets that a matter of village concern involving the entire village, not merely a few families, was compelled to be taken before the courts whereas it should have been properly left for resolution by the village council. There was some impatience with the village council's efforts and attempts at extra-judicial resolution but we leave the parties with two observations: the redefinition of boundaries by the village council must be recognized as a matter which simply does not lend itself to an overnight conciliatory exercise; secondly, this Court has once said that the "Samoan way of life [is]---discussions, discussions, <u>and</u> discussions in a good faith effort to iron out disputes." <u>Fairholt v. Aulava</u>, 1 A.S.R.2d 73, 78 (1983). In that the speedier court resolution anticipated by some of the parties has not come about, we are disposed to endorse the recommendations of Chief Magalei and urge that a redefinition of boundaries within Leaveave be taken up expeditiously by the council. To facilitate these ends and to preserve any and all rights of the parties hereto, the Court invokes the authority of A.S.C.A. § 3.0242 (allowing procedural flexibility in the Lands and Titles Division as most consistent with natural justice and convenience) and dismisses these matters without prejudice.[4]

It is so Ordered.

---

[4] Our order of dismissal, of course, does not apply to the land Puna. As previously noted, no one contested Maea's claim to Puna. When no adverse claim is filed within sixty days of a properly presented application for registration, the Territorial Registrar is compelled to register the land. <u>See</u> A.S.C.A. § 37.0103.